AO 106 (Rev. 06/09) Application for a Search Warrant

FILED

MAR 2 7 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
)
4977 1/2 El Cajon Boulevard )   19MJ1264
San Diego, CA 92115 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4 (incorporated by reference).

located in the _____ **Southern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and 846. | Possession of Controlled Substances with intent to Distribute and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached Affidavit of DEA Special Agent Leo Tanlu (incorporated by reference).

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Leonell Tanlu_
*Applicant's signature*

_Leonell Tanlu_
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **3/26/19**

_signature_
*Judge's signature*

City and state: San Diego, California

Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-4

1. **Target Location 4** is located at 4977 ½ El Cajon Boulevard, San Diego, California 92115.  **Target Location 4** is a white cinder block structure that is above **Target Location 3** with a brown staircase that begins west by the alleyway near the rear door of **Target Location 3**.  The staircase leads up to the white door with a white screen door.  No numbers are displayed on the front door or structure.  Note:  During the course of this investigation, the front door of **Target Location 4** had the numbers "**4977 ½**" on the front door, however on March 16, 2019, investigators observed that there were no numbers on the front door.



## ATTACHMENT B

## ITEMS TO BE SEIZED

1.      Controlled substances, paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

2.      Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3.      Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

4.      Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining

1   false identification including birth certificates, drivers license, immigration cards and other
2   forms of identification which the same would use other names and identities other than his
3   or her own.

4

5   5.      All incoming telephone calls received at the residence during the execution of the
6   search warrant and all calls received on cellular telephones found during the execution of
7   the warrant.

8

9   6.      Devices used to conduct counter surveillance against law enforcement, such as radio
10  scanners, police radios, surveillance cameras and monitors and recording devices and
11  cameras.

12

13  7.      Photographs and video and audio recordings which document an association with
14  other coconspirators and/or which display narcotics, firearms, or money and proceeds from
15  narcotics transactions.

16

17  8.      Police radio scanners, pagers, cellular telephones, facsimile machines, telephone
18  answering machines, Caller ID system, and prepaid telephone cards associated with the
19  following individuals:

20          Manoxay INSISIENMAY aka "Mano,"

21          Manosang INSISIENMAY aka "Dustin,"

22          Troy COOLEY,

23          Linda INSISIENMAY,

24          Malive PARKER,

25          Heather ODOM,

26          Nalong KEOMANIVONG aka "Elmo."

27

28
                                            2

The evidence to be seized under the following paragraphs 9 – 13 shall be limited to the period of September 20, 2017 to the present.

9.      Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.

10.     Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

11.     Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

12.     Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

13.     Authorization to search the cellular telephone includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone.  The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

            a.      telephone numbers of incoming/outgoing calls stored in the call registry;

            b.      Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

3

1    c.    Any incoming/outgoing text messages relating to violations of 21 U.S.C. §§
2  841(a)(1) and 846;

3    d.    telephone subscriber information;

4    e.    the telephone numbers stored in the cellular telephone and/or PDA; and

5    f.    any other electronic information in the stored memory and/or accessed by the
6  active electronic features of the digital or cellular phone including but not limited to
7  photographs, videos, e mail, and voice mail relating to violations of 21 U.S.C. §§ 841(a)(1)
8  and 846.

4

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Leonell Tanlu, being duly sworn under oath, declare and state:

## EXPERIENCE AND TRAINING

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent (SA) with DEA and have been so employed since 2004. I am currently assigned to the DEA San Diego Division Office. I have received formal training and have experience in narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources in the furtherance of the illegal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

1   3.      The following is based my own investigation, oral and written reports by

2   other law enforcement officers, physical surveillance, interviews, database and public

3   records checks, searches, telephone toll analysis, and other investigation. Since this

4   affidavit is for a limited purpose, I have not included every fact I know about this

5   investigation. I set forth only facts necessary to establish foundation for the requested

6   warrant. Conversations and discussions below are set forth in substance unless noted.

7                              **REQUESTED SEARCH WARRANTS**

8   4.      I submit that the facts contained herein demonstrate probable cause to

9   believe that the fruits, instrumentalities and evidence of violations of Title 21, United

10  States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled

11  Substances); Title 21, United States Code, Sections 841(a)(1) (Possession of Controlled

12  Substances with intent to Distribute); Title 21, United States Code, § 843(b) (Unlawful

13  Use of a Communication Facility to Facilitate the Distribution of a Controlled

14  Substance); and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h)

15  (Conspiracy  to  Launder  Monetary  Instruments);  more  fully  described  in

16  ATTACHMENT B; will be found at the residence (including the structure, all attached

17  and unattached structures, rooms, attics, basements, garages, and parking spaces

18  (including vehicles and trailers parked therein) assigned to or part of the location;

19  storage areas, safes, briefcases, containers, trash areas within the location to be

20  searched, surrounding grounds and outbuildings assigned to or part of the location) at

21  the **Target Locations**:

22      a.   **Target Location 1**:  1988 Hazelwood Place, San Diego, CA 92105;

23      b.   **Target Location 2**:  (DROPPED FROM WARRANT APPLICATION)

24      c.   **Target Location 3**:  "City Pub" – 4977 El Cajon Boulevard, San Diego,

25          CA 92115;

26      d.   **Target Location 4**:  4977 ½ El Cajon Boulevard, San Diego, CA 92115;

27      e.   **Target Location 5**:  6533 Lemerand Avenue, San Diego, CA 92115;

28      f.   **Target Location 6**:  6540 Lemerand Avenue, San Diego, CA 92115;

g.   **Target Location 7**:  154 Daisy Avenue, Apt. #C, Imperial Beach, CA 91932;

h.   **Target Location 8**:  4697 51st Street, Apt. #2, San Diego, CA 92115;

i.   **Target Location 9**:  4091 Winona Avenue, San Diego, CA 92105;

j.   **Target Location 10**:  4321 Altadena Avenue, San Diego, CA 92115;

k.   **Target Location 11**:  6832 Upton Court, San Diego, CA 92111;

l.   **Target Location 12**:  701 W. Beech Street, Apt. #2203 San Diego, CA 92101;

m.   **Target Location 13**: 4747 Crooked Creek, San Diego, CA 92113.

This affidavit is submitted in support of search warrant applications for **Target Location 1, Target Location 3** and **Target Location 4**, which are more fully described at Attachments A-1, A-3 and A-4 (hereinafter collectively referred to as "**Target Locations**"). After a careful analysis of the evidence, investigators opted not to pursue the search warrant application for **Target Location 2**.  In order to avoid scriveners' errors, the **Target Location** numbering format was not changed.  Because of the overlapping nature of the criminal activity, Crooked Angels **Target Locations 5 - 13** are also referenced in this affidavit.  This affidavit incorporates by reference the Affidavits submitted in support of the applications for **Target Locations 5 – 13**.

## FACTS ESTABLISHING PROBABLE CAUSE

### A.   Investigation Background

5.   The "Crooked Angels" investigation targeted gang members and affiliates who are involved in the distribution of controlled substances in San Diego and out of state.  The gangs involved include: Oriental Crips; Tiny Rascal Gang; Oriental Killer Boys; Viet Boys; and Linda Vista 13.  The investigation Target Subjects, however, ignored gang affiliation while distributing drugs and readily distributed drugs to individuals affiliated with rival gangs.  The Target Subjects engaged in drug distribution at their residences in the City Heights, College Grove and Imperial Beach communities in San Diego.

3

6.      During the investigation, law enforcement learned that several of the Target Subjects were involved in the distribution of prescription opioids. Additionally, investigators determined that several of the Target Subjects were involved in the distribution of counterfeit prescription opioids laced with Carfentanil. Investigators determined that one individual died as a result of ingesting the Carfentanil and another individual was seriously injured.

7.      Additionally, several of the Target Subjects distributed marijuana to locations along the eastern seaboard using United Parcel Service (UPS) and the United States Postal Service. Investigators identified Manoxay INSISIENMAY as the principle marijuana distributor who obtained marijuana from marijuana grow operations in the Central District of California and then distributed it locally or shipped it out of state. INSISIENMAY operated from a local drinking establishment "City Pub" on El Cajon Boulevard. Investigators learned that the Target Subjects processed and packaged marijuana at the apartment attached to the rear of the "City Pub." Investigators seized numerous parcels containing marijuana destined for Maryland where other individuals distributed the marijuana. Investigators also seized parcels containing drug proceeds mailed from out of state locations to San Diego. During the investigation, investigators identified several individuals operating funnel accounts[1] on behalf of INSISIENMAY. Drug distributors on the east coast made cash deposits into the funnel accounts then the Target Subjects withdrew the cash in San Diego. Investigators identified in excess of $100,000 in cash transactions through the funnel accounts. Investigators executed three marijuana-grow search warrants in the Central District of California and seized over 7000 marijuana plants. In addition, investigators executed a search warrant at an Air BnB and seized over $50,000 from out of state marijuana buyers who traveled from Florida to San Diego to buy marijuana.

---

[1] A "funnel account" is a financial account used by drug traffickers to accept cash deposits of drug sale proceeds in one location that is later withdrawn from a different location.

**B.**   **Indictment**

8.      On March 14, 2019, a federal grand jury in the Southern District of California, returned three sealed indictments.  The three indictments charged twenty defendants.  The indictments allege violations of: Title 21, United States Code, Sections 841(a)(1) and 846, Conspiracy to Distribute Controlled Substances; Title 21 United States Code, Section 841(a)(1), Possession of Cocaine/Methamphetamine With Intent to Distribute; Title 21, United States Code, Section 841, Distribution of Carfentanil Resulting in Death; and Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(h), Conspiracy to Launder Monetary Instruments.  The indicted individuals include:

> Dat Pham Tien Tran aka "Damian,"
> Darren Pham Tran aka "Denny,"
> Anthony Vibounphonh aka "Ant,"
> Armando Angeles,
> Kristine Tuyetvan TRUONG aka "K,"
> Nalong KEOMANIVONG aka "Elmo,"
> Minh PHAM,
> Javier PENALOZA,
> Jimmy SENGPASEUTH,
> Nava Jeff PHETHDARA,
> Eric ANGELES
> Manoxay INSISIENMAY aka "Mano"
> Manosang INSISIENMAY aka "Dustin"
> Amphone VINSON
> Daorine DETHAMPHAIVAN aka "Tik"
> Egzon HAXHIJA aka "X" aka "Florida"
> Troy COOLEY
> Linda INSISIENMAY
> Malive PARKER
> Heather ODOM

**C.**   **Wiretaps**

9.      On May 13, 2017, United States District Judge Janis L. Sammartino, Southern District of California, issued an Order authorizing the interception of communications to and from a telephone used by Anthony VIBOUNPHONH aka "Ant" (hereinafter "TT1"), and a telephone used by Nalong KEOMANIVONG aka "Elmo" hereinafter "TT2").

5

10.     On August 31, 2017, Judge Sammartino, authorized renewed interception of TT1 and initial interception of a telephone used by Minh Huu PHAM (hereinafter "TT3").

11.     On March 1, 2018, Judge Sammartino, authorized the initial interception of communications to and from telephones used by: Manoxay INSISIENMAY aka "Mano" (hereinafter "TT4"); Nava Jeff PHETHDARA (hereinafter "TT5"); Armando ANGELES aka "Mando" (hereinafter "TT6"); Javier PENALOZA (hereinafter "TT7"), and Kristine TRUONG (hereinafter "TT8").

12.     On April 27, 2018, Judge Janis L. Sammartino, authorized the renewed interception of TT4, TT6, TT7, and the initial interception of a telephone used by Dat TRAN aka "Damien" (hereinafter "TT9"); a second telephone used by Manoxay INSISIENMAY aka "Mano" (hereinafter "TT10"), and a second telephone used by Javier PENALOZA (hereinafter "TT11").

## TARGET LOCATIONS 1, 3, and 4

13.     During the wiretap interceptions of TT4 and TT10, investigators learned that Manoxay INSISIENMAY and numerous co-conspirators were engaged in a lucrative marijuana distribution operation. INSISIENMAY obtained marijuana from growers in the Central District of California, then distributed the marijuana locally and also shipped it out of state to a number of distributors. Intercepted communications revealed that Manoxay INSISIENMAY (hereinafter "INSISIENMAY") shipped significant quantities of marijuana to his son Manosang Insisienmay (hereinafter referred to by his aka "DUSTIN") in Maryland. DUSTIN distributed the marijuana and then made cash deposits into funnel accounts identified by INSISIENMAY. INSISIENMAY used numerous funnel accounts held by co-conspirators to launder drug proceeds. Co-conspirators Malive PARKER, Heather ODOM, Troy COOLEY, and Amphone VINSON provided their bank account information to INSISIENMAY. INSISIENMAY then relayed that information to drug distributors who made cash

1 deposits into the accounts. Additionally, LINDA Insisienmay (hereinafter "LINDA")
2 laundered drug proceeds for INSISIEMAY using her nail salon.

3     14.    **Target Location 1** is the residence of Manoxay INSISIENMAY and his
4 wife LINDA Insisienmay. Investigators learned that DUSTIN now lives at **Target**
5 **Location 1** with LINDA and INSISIENMAY. On March 8, 10, 13, 15, and 16, 2019
6 investigators observed DUSTIN's vehicle parked at **Target Location 1**. On March 19,
7 2019, investigators observed LINDA's vehicle parked in the **Target Location 1**
8 driveway and DUSTIN's vehicle parked nearby.

9     15.    **Target Location 3** is the City Pub bar. INSISIENMAY owns the City
10 Pub business jointly with a third party. INSISIENMAY exercises control of the
11 business to include hiring employees. For example, intercepted calls from the head
12 bartender, "James" would complain to INSISIENMAY regarding employee's lack of
13 reliability. "James" would request INSISIENMAY to replenish alcohol in **Target**
14 **Location 3**. In addition, INSISIENMAY was intercepted over TT10 stating that he
15 kept keys to **Target Location 4** in **Target Location 3**.

16     16.    **Target Location 4** is co-located in the same structure as **Target Location**
17 **3**. **Target Location 4** is an apartment on the second floor, above **Target Location 3**
18 and is accessed by a separate entrance that is above the rear entrance to **Target Location**
19 **3**. The conspirators referred to **Target Location 4** as "the Studio" and used it to stash,
20 process, and package controlled substances. Malive PARKER currently resides in
21 **Target Location 4**, and before her Nalong KEOMANIVONG resided there.
22 Investigators also believe that Troy COOLEY lived there with Malive PARKER during
23 the wiretap interception period.

24     17.    On March 8, 10, 13, and 15, 2019, investigators observed PARKER's car
25 parked in a lot at the rear of **Target Location**s **3 & 4**. On March 16, 2019, investigators
26 spoke to an unknown adult male at **Target Location 4**. The unknown male said that
27 "Malive" was not home, but would be back soon. He further stated that he lived at
28 **Target Location 4** with "Malive." Investigators also asked about INSISIENMAY. The

7

1 unknown male further said that "Mano" (INSISIENMAY) is usually downstairs at the
2 bar (**Target Location 3**).  The unknown male volunteered that "James" (the City Pub
3 bartender) in the bar would know "Mano's" whereabouts.  He also said that "Mano"
4 had been in a coma for a while after he was assaulted in the bar (**Target Location 3**).
5 The unknown male stated that INSISIENMAY was "good" but that he had cut back on
6 his appearances at the bar.

### *May 8, 2018 – Drug Proceeds Mailed to Target Location 1*

8      18.    On May 7, 2018, at approximately 1:25 p.m. INSISIENMAY (TT10)
9 called an individual known to investigators as "Smooth."  During this call
10 INSISIENMAY explained to Smooth that an individual identified as "Trell" mailed a
11 parcel containing a magazine to INSISIENMAY at **Target Location 1**.  Further, that
12 Trell claimed to have secreted money orders in the magazine that were payment for
13 drugs shipped by INSISIENMAY to Trell.  INSISIENMAY explained that he and his
14 wife (LINDA) examined the parcel and it did not contain the money orders.
15 INSISIENMAY also told Smooth that he would send a spreadsheet to Smooth
16 identifying the amounts paid and owed (for controlled substances).  Investigators
17 subsequently intercepted an MMS message containing a photograph of a spreadsheet
18 sent by INSISIENMAY to Smooth.

19      19.    On May 8, 2018, investigators intercepted communications between
20 INSISIENMAY (TT4) and "Trell" indicating that "Trell" mailed a parcel to **Target**
21 **Location 1**.  Further intercepted communications between INSISIENMAY and another
22 individual indicated that the parcel contained $10,000 in payments for drugs
23 INSISIENMAY (TT4) "fronted" to Trell.  On May 9, 2018, Investigators intercepted a
24 parcel addressed from "Mike JONES" to Heather ODOM at **Target Location 1**.
25 Investigators obtained a search warrant (18MJ2387) for the parcel.  When investigators
26 executed the search warrant they found $10,000.00 in money orders.  The money orders
27 were seized by the investigators.

28

1   ### *May 30, 2018 – Drug Proceeds Mailed to Target Location 3*

2   20.   During the investigation, investigators established that Brandon Sanders
3   distributed controlled substances in Indiana that were supplied by Manoxay
4   INSISIENMAY. On May 23, 2018, Investigators intercepted communications between
5   Brandon Sanders and Manoxay INSISIENMAY.   During that communication,
6   INSISIENMAY instructed Sanders to send drug payments in the form of money orders
7   to **Target Location 3**. In reply, Sanders sent a text message containing a photograph
8   depicting a UPS document with a package tracking number.   On May 24, 2018,
9   investigators intercepted the parcel and obtained a search warrant. On May 30, 2018,
10  investigators executed the search warrant and seized $6,000.00 in money orders hidden
11  inside a "Word-Find" puzzle book.

12  ### *September 21, 2017 – KEOMANIVONG Distributes Fentanyl Sample to CS*

13  21.   On September 20, 2017, a cooperating source of information[2] (hereinafter
14  "CS") contacted KEOMANIVONG.   KEOMANIVONG told CS he had a brick of
15  fentanyl and wanted to sell it. CS and KEOMANIVONG agreed to meet on September
16  21, 2017, so KEOMANIVONG could provide CS with a free sample of fentanyl.   The
17  following day, CS and KEOMANIVONG agreed to meet at the City Pub (**Target
18  Location 3)**.

19  22.   On September 21, 2107, at approximately 3:40 p.m., investigators met with
20  CS. Investigators searched CS and CS' vehicle with negative results.   CS was equipped

21  _____

22  [2]   All communications during this controlled buy were audio recorded and observed by investigators
23  conducting surveillance. CS has been cooperating with the DEA since 2013 with periods in which CS was
     deactivated as a confidential source. CS began cooperating for after being arrested in connection with the
24  transportation of seven tons of marijuana from Mexico to Los Angeles for which CS was not charged due to
     his/her cooperation. CS has continued to cooperate with the DEA in exchange for monetary payment and has
25  been paid approximately $20,000 to date. CS has been deemed reliable and his/her cooperation has led to
26  several arrests and seizures of drugs. CS's criminal history includes 2017 DUI misdemeanor conviction, 2015
     grand theft auto conviction with 365 days in custody (CS was deactivated as confidential source by the DEA
27  prior to this arrest and conviction), 2007 driving with suspended license with 10 days in custody, and CS was
     arrested in December 2012 for sale/furnish marijuana.

28

1 │ with a transmitter/recorder. At approximately 3:45 p.m., investigators established
2 │ surveillance at **Target Location 3**. At approximately 4:10 p.m., investigators observed
3 │ KEOMANIVONG arrive in the parking lot at the rear of City Pub, **Target Location 3**
4 │ and 4.  KEOMANIVONG and two females exited the vehicle and entered the second
5 │ floor residence (**Target Location 4**). At approximately 4:15 p.m., CS departed the meet
6 │ location and went to **Target Location 3**.   CS contacted KEOMANOVING via
7 │ telephone.

8 │     23.    At approximately 4:16 p.m., investigators observed KEOMANIVONG
9 │ depart **Target Location 4** and approach the front passenger side of CS' vehicle.
10 │ KEOMANIVONG invited CS up to the apartment.  CS declined.  KEOMANIVONG
11 │ returned to **Target Location 4**.   A minute later, investigators observed
12 │ KEOMANIVONG exit the apartment and enter the front passenger side of CS' vehicle.
13 │ KEOMANIVONG showed a clear plastic bag containing the suspected fentanyl.
14 │ KEOMANIVONG pinched off a sample of the suspected fentanyl for the CS and placed
15 │ the substance into a plastic bag the CS had in the center console inside CS' vehicle.  CS
16 │ told KEOMANIVONG CS would return later to purchase a larger amount of fentanyl.
17 │ KEOMANIVONG exited CS' vehicle and walked towards the rear of **Target Location**
18 │ **3**.  CS departed the area followed by investigators.

19 │     24.    Investigators followed CS to a pre-designated meet location.  Investigators
20 │ took custody of the suspected fentanyl.  Investigators searched CS and CS's vehicle
21 │ with negative results. Investigators submitted the substance to the DEA Lab which
22 │ determined that the substance was .44 grams of Noscapine Hydrochloride.  Noscapine
23 │ Hydrochloride is a common cutting agent used with fentanyl.

24 │     ***September 27, 2017 – Controlled Buy/Seizure 887 Grams of Methamphetamine***
25 │     ***from KEOMANIVONG and COOLEY***

26 │     25.    On September 26, 2017, CS contacted KEOMANIVONG at telephone
27 │ number (858) 205-0202 and placed an order for two pounds of methamphetamine.
28 │ KEOMANIVONG agreed to sell the CS the methamphetamine the next day.

1  Investigators were able to have the CS introduce a UC to conduct the methamphetamine

2  purchase.

3       26.   On September 27, 2018, at approximately 10:56 a.m., KEOMANIVONG

4  sent a text message to CS which read, "What time today?" CS texted, "She (UC3) left

5  Anaheim, she should be there in an hour, she made another pick up for me. She'll call

6  you." KEOMANIVONG texted, "Kool."

7       27.   At approximately 12:45 p.m., investigators established surveillance at

8  **Target Location 3** and **4**. Investigators saw KEOMANIVONG exit **Target Location**

9  **4** and enter his black Saturn. Investigators followed KEOMANIVONG to the 6100

10  block of Terrasera where KEOMANIVONG exited the Saturn. KEOMANIVONG

11  walked towards 6101 Adelaide Avenue.

12       28.   At approximately 1:25 p.m., UC3 contacted KEOMANIVONG and

13  advised KEOMANIVONG that she was on her way to meet KEOMANIVONG to pick

14  up the methamphetamine. KEOMANIVONG stated he had the methamphetamine and

15  asked UC if she had the $6700 to buy the methamphetamine. UC3 and

16  KEOMANIVONG agreed to meet at the Fry's Electronics Store near Aero Drive where

17  they had met during the one-ounce cocaine buy on May 18, 2017.

18       29.   At approximately 1:37 p.m., investigators observed KEOMANIVONG

19  and COOLEY exit the corner apartment at 6101 Adelaide Avenue, San Diego.

20  KEOMANIVONG entered the driver side of the Saturn and COOLEY the front

21  passenger side. KEOMANIVONG and COOLEY departed and were followed by

22  investigators.

23       30.   At approximately 1:43 p.m., investigators observed KEOMANIVONG

24  arrive back **Target Location 4**. KEOMANIVONMG exited the vehicle and entered

25  **Target Location 4**. COOLEY remained in the front passenger seat of the vehicle. A

26  short time later, investigators saw KEOMANIVONG exit **Target Location 4** carrying

27  a yellow/lime shopping bag. KEOMANIVONG entered the vehicle with COOLEY still

28  seated in the front passenger seat and departed.

1   31.   San Diego Police Gang Suppression Team Officers conducted a traffic
2   stop of the vehicle and made contact with KEOMANIVONG and COOLEY.   Officers
3   searched the vehicle and found a large plastic bag on the front passenger side floorboard.
4   Inside the bag were four sandwich size zip lock bags containing the methamphetamine.
5   KEOMANIVONG and COOLEY were detained and later released.   The DEA Lab
6   determined the seized substance to be 878 grams of methamphetamine.

7   *O'Neil Interview*

8   32.   During November of 2017, Caitlyn O'Neil overdosed on a pill provided
9   by Dat TRAN.   On January 30, 2018, investigators interviewed O'Neil.   O'Neil told
10   investigators the day she overdosed she was at Dat TRAN'S house.   O'Neil told
11   investigators she met Dat TRAN at the City Pub Bar (**Target Location 3**).   O'Neil said
12   they started hanging out and Dat TRAN started buying her cocaine and "Molly" from
13   people at **Target Location 3**.   O'Neil told investigators that Dat TRAN has a black
14   briefcase full of pills.   O'Neil told investigators there are a lot of drugs being sold at
15   **Target Location 3** and a lot of marijuana is being sold out of the apartment above City
16   Pub (**Target Location 4**).   Investigators gave O'NEIL their contact information and
17   ended the interview with O'Neil.

18   33.   At approximately 1:30 p.m. the same day, O'Neil called investigators and
19   said she had been looking through call logs on her cell phone and she found a number
20   to Dat TRAN's "best friend and closest business partner "MANO"' (Manoxay
21   INSISIENMAY) and gave his number.   O'Neil said "MANO" is the owner of the City
22   Pub (**Target Location 3**) but she has heard there other owners as well.   O'Neil then
23   described other drug distribution activity, all of which was consistent with the
24   investigation.

25   34.   Investigators later approached O'Neil for the purpose of obtaining her
26   cooperation and assistance.   On February 5, 2018, investigators met with O'Neil.
27   O'Neil explained that the drugs are being stored, distributed and mailed from the
28   apartment (**Target Location 4**) above City Pub (**Target Location 3**) and identified

Nalong "Elmo" KEOMANIVONG as the resident of the apartment and that he has a 12-year-old child living with him. O'Neil stated that she has purchased drugs directly from Dat TRAN and Troy COOLEY. O'Neil stated Manoxay INSISIENMAY owns City Pub, (**Target Location 3**) and services all patrons at the bar for various drugs. She stated Manoxay INSISIENMAY is the head of the group and supplied various drugs to Dat TRAN as well as others. O'Neil said she has been to Dat TRAN's residence, (**Target Location 5**) and INSISIENMAY'S residence (**Target Location 1**) and has observed drugs at both residences. O'Neil later conducted two controlled cocaine buys from Dat TRAN at **Target Location 5**.

### *May 9, 2018 – 45.39 Pounds Marijuana Seizure INSISIENMAY, DETHAMPHAIVAN, SANDERS, and Dat TRAN.*

35.     On May 7, 2018, at approximately 8:48 p.m., INSISIENMAY (TT10) sent a text message to Brandon Sanders. The text message read, "I have 18 (pounds of marijuana) of the $700 here now if u want to see it bro." Sander's texted, "Ok omw."

36.     At approximately 9:00 p.m., investigators observed Sanders arrive at the alley parking lot behind **Target Location 3**. At the same time, Manoxay INSISIENMAY received an incoming telephone call on TT10 from SANDERS. SANDERS said he was in the rear parking lot.

37.     On May 8, 2018, at approximately 11:56 a.m., INSISIENMAY (TT4) called Ai Puc (aka "Dennis") for "7 bags of GD (Grand Daddy – marijuana) with the rest." Ai Puc asked if "Green Crack for 7 bags." INSISIENMAY said, "Yes…Seven bags of Green Crack and the rest of 46 bags…What time can Tik (DETHAMPHAIVAN) meet me so I can let my customers know?" Ai Puc replied, "Around nine or ten." DETHAMPHAIVAN then talked to INSISIENMAY about what time to travel to San Diego. DETHAMPHAIVAN replied, "Yes…How much should I bring?" INSISIENMAY replied, "Forty-six bags and seven bags of Green Crack…Come to the bar (**Target Location 3**)."

38.    On May 9, 2018, INSISIENMAY (TT10) texted Sanders, "Morning, the driver will be at the studio (**Target Location 4**) around 8:25 a.m." At approximately 8:54 a.m., DETHAMPHAIVAN arrived and Sanders arrived at approximately 9:37 a.m.

39.    At approximately 12:00 p.m., investigators observed Manoxay INSISIENMAY arrive and go to **Target Location 4**. At approximately 12:15 p.m., investigators observed SANDERS walk up the stairs and enter the same apartment, **Target Location 4**.

40.    At approximately 2:04 p.m., INSISIENMAY (TT10) called Dat TRAN. INSISIENMAY asked, "Can you drop off two boxes...Check what time Fed-Ex...Same as last time." TRAN replied, "Postal Annex?" INSISIENMAY replied, "Yes." At approximately 3:50 p.m., investigators observed Dat TRAN arrive and begin loading boxes into his truck with Sanders. TRAN departed the area and investigators followed him to a Postal Annex located at 7107 Broadway, Lemon Grove. TRAN dropped the box off at Postal Annex, then departed. Investigators seized the box which was addressed to Amy Lee 3627 Elmcrest Drive Fort wayne, Indiana.

41.    Investigators then followed TRAN to a Postal Annex located at 8030 La Mesa Blvd, La Mesa. TRAN carried a box inside the Postal Annex and departed a moment later without the box. Investigators entered the Postal Annex and seized the box. TRAN walked back into the Postal Annex while investigators were still in the store. TRAN discussed not having enough money to complete the shipping of the package but the clerk accepted the parcel anyway because investigators had already seized the parcel. The parcel was addressed to Robert Lee 730 Ridgewood Drive, Fort Wayne, Indiana.

42.    On May 16, 2018 investigators searched the boxes (Exhibit 28 and 29) pursuant to a federal search warrant and found 15 kilograms of marijuana (33.58 pounds) in one parcel and 5.3 kilograms (11.81 pounds) of marijuana in the other.

14

*May 24, 2018 –Marijuana Grow Search Warrant 40060 Beaver Avenue, Aguanga, CA – 6357 marijuana plants, 83 kilograms of processed marijuana and a Remington 7400 30-06 rifle seized.*

43.   On March 14, 2018, investigators intercepted communications on TT4 between INSISIENMAY and Amphone VINSON regarding marijuana distribution. Investigators established surveillance at **Target Location 3** and **Target Location 4** and saw VINSON at the rear parking lot.   Investigators then followed her to an area near 40060 Beaver Avenue, Aguanga, California.  On May 5, 2018, investigators conducted aerial reconnaissance over 40060 Beaver Avenue, Aguanga, California.   During the aerial reconnaissance flight, investigators observed multiple outdoor plots containing marijuana plants, and multiple greenhouses type structures containing marijuana plants. On May 22, 2018, United States Magistrate Judge Kiya Kato, Central District of California, signed a search warrant for 40060 Beaver Avenue, Aguanga, California (5:18MJ00225).  On May 24, 2018, investigators from DEA, FBI, USBP, USPS, and Riverside County Sheriff's Department executed the search warrant. Investigators seized 6357 marijuana plants, approximately 82.7 kilograms of processed marijuana, and a Remington 7400 30-06 rifle.

*May 24, 2018 –Marijuana Grow Search Warrant 37481 Higgins Road, Anza, CA – 259 marijuana plants, 143.9 kilograms of processes marijuana, and $14,021.00 seized*

44.   On May 8, 2018, investigators intercepted telephone communications indicating that INSISIENMAY was going to 37481 Higgins Road, Anza, California, in order to pick up pound quantities of marijuana and bring the marijuana to San Diego, California for shipment to Fort Wayne, Indiana.  Investigators established surveillance at the City Pub rear parking lot (**Target Location 3** and **4**) and saw INSISIENMAY and COOLEY depart in a white Mercedes.  Investigators followed them to 37481 Higgins Road, Anza, California.  On May 9, 2018, investigators conducted an aerial reconnaissance flight over 37481 Higgins Road, Anza, California.  During the aerial

reconnaissance flight, investigators saw numerous marijuana plots and greenhouses containing marijuana. On May 22, 2018, United States Magistrate Judge Kiya Kato, Central District of California, signed a search warrant for 37481 Higgins Road, Anza, CA (5:18MJ00226). On May 24, 2018, investigators from DEA, FBI, USBP, USPS, and Riverside County Sheriff's Department executed the search warrant. Investigators seized 259 marijuana plants, 143.9 kilograms of processed marijuana, and an additional $14,021.00.

### *June 8, 2018 – Marijuana Grow Search Warrant 45149 Goodlett Road, Aguanga, CA – 1179 marijuana plants, 12.2 kilograms of processed marijuana seized.*

45.     Investigators learned through intercepted communications that Egzon HAXHIJA aka "X" traveled from Florida to San Diego to obtain marijuana from INSISIENMAY. Further, investigators learned that INSISIENMAY intended to obtain the marijuana from a grower in Aguanga, California to distribute to HAXHIJA. On May 28, 2018, HAXHIJA met INSISIENMAY at **Target Location 4**. Thereafter, HAXHIJA went to a Home Depot to buy bins to ship marijuana to Florida. HAXHIJA later delivered the bins to **Target Location 4**.

46.     On May 29, 2018, investigators followed HAXHIJA and INSISIENMAY to a grow operation at 45149 Goodlett Road, Aguanga. After HAXHIJA and INSISIEMAY returned to San Diego, HAXHIJA went to an Air B&B residence on Opal Street in San Diego. Investigators executed a search warrant at the Air B&B and seized $53,962.00.

47.     On June 3, 2018, investigators conducted aerial reconnaissance over the 45149 Goodlett Road, Aguanga, grow operation and saw marijuana. On June 6, 2018, United States Magistrate Judge Sheri Pym, Central District of California, signed a search warrant for 45149 Goodlett Road, Aguanga, California. On June 8, 2018, investigators from DEA, FBI, USBP, and Riverside Sheriff's Department executed the warrant. Investigators seized 1,179 marijuana plants, 12.2 kilograms of processed marijuana, and a Marlin 22LR rifle.

16

### *Money Laundering INSISIENMAY, LINDA, DUSTIN, PARKER & ODOM*

48.     Manoxay INSISIENMAY shipped marijuana to customers on the east coast and enlisted numerous associates to funnel money from the marijuana sales back to San Diego. During the course of wiretap interceptions, investigators identified bank accounts used to facilitate the money laundering.

49.     Manosang Insisienmay (hereinafter "DUSTIN") is the brother of Manoxay INSISIENMAY. During the wiretap interception periods, DUSTIN lived in Maryland. Manoxay INSISIENMAY shipped marijuana to DUSTIN who sold the marijuana then paid Manoxay INSISIENMAY using funnel accounts identified by Manoxay INSISIENMAY. Over a three-month period, investigators intercepted numerous text message exchanges and telephone calls between DUSTIN and Manoxay INSISIENMAY with detailed discussions about accounts, and balances owed and paid for marijuana. Additionally, DUSTIN mailed money orders directly to Manoxay INSISIENMAY.

50.     On **March 6, 2018**, at approximately 1:18 p.m., 1:19 p.m., 1:20 p.m., and 3:50 p.m., Manoxay (TT4) and DUSTIN exchanged the following text messages:

    a.   Manoxay to DUSTIN: Heather M Odom. Wells Fargo 3160535211.

    b.   DUSTIN to Manoxay: You don't have to send it out yet if you don't want to. Looking at tomorrow.

    c.   Manoxay to DUSTIN: Okay. How much are you depositing tomorrow?

51.     On **March 7, 2018**, at approximately 9:30 a.m., 1:24 p.m., 1:25 p.m., 1:26 p.m., and 1:27 p.m. Manoxay (TT4) and DUSTIN exchanged the following text messages:

    a.   DUSTIN to Manoxay: I can send you 4 today or the full thing on Friday. Looking to having something sent on Saturday to receive Monday.

    b.   Manoxay to DUSTIN: Did you go to the bank?

    c.   DUSTIN to Manoxay: I'm running late right now. On the way back into the city.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    d. <u>Manoxay to DUSTIN</u>: I need to pay growers.

    e. <u>DUSTIN to Manoxay</u>: Would the AM be a bad time?

    f. <u>Manoxay to DUSTIN</u>: I guess.

    g. <u>DUSTIN to Manoxay</u>: Okay

52. Malive PARKER facilitated Manoxay INSISIENMAY's marijuana distribution scheme in a number of ways. During surveillance and intercepted calls, investigators established that PARKER mailed marijuana parcels on Manoxay INSISIENMAY's behalf. During February and March of 2018, PARKER laundered over $50,000 in cash deposited in east coast banks. Intercepted communications corresponded with cash deposited in her account and cash withdrawals from her account.

    a. On **March 21, 2018**, at 8:56 a.m., Manoxay INSISIENMAY (TT4) texted PARKER: Please withdraw $5K ($5,000) today.

    b. On **March 21, 2018**, at 3:11 p.m., PARKER texted Manoxay INSISIENMAY (TT4): I got your money at the studio (**Target Location 4**).

    c. On **March 26, 2018**, during an intercepted call, PARKER asked Manoxay INSISIENMAY to stop putting money into her account because it was suspended. Manoxay INSISIENMAY apologized and said that his guy "fucked it up." Manoxay INSISIENMAY asked how much was deposited and PARKER replied "$5000."

    d. On **March 27, 2018**, during an intercepted call, PARKER told Manoxay INSISIENMAY that she just left the bank and that she withdrew $2000 and would have to take out the rest tomorrow. PARKER then told Manoxay INSISIENMAY that she was driving back to the studio (**Target Location 4**) to drop off the money. Manoxay INSISIENMAY agreed to meet her there.

    e. Bank records reflect all of these transactions.

53.     Heather ODOM was Dat TRAN's girlfriend and packaged marijuana for him to distribute for Manoxay INSISIENMAY.     Additionally, ODOM delivered marijuana parcels to a variety of common carriers.  From January 2018 through April 2018, ODOM laundered over $99,000 in cash deposits from the east coast. Investigators intercepted numerous conversations between Manoxay INSISIENMAY and ODOM corresponding to the bank transactions.     Additionally, investigators intercepted parcels containing $24,800 worth of money orders.     Intercepted communications indicate that Manoxay INSISIENMAY directed ODOM to retrieve the money orders from the post office, and she attempted to do so.

54.     According to bank records for one of the deposits into ODOM's account, Rohan Campbell, a citizen of Jamaica residing in Ocala, Florida, "came in with $3000 smelling of pot to deposit in Odom's account saying she is his cousin in CA to pay for her rent and bills.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

55.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a.     Individuals involved in drug trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b.     Individuals involved in drug trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drug sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are collected.  I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records

and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

      c.     Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the drugs. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

      d.     Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in drug trafficking.

      e.     Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing drug business. Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

      f.     Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their drug and firearms dealings.

1    g.    Residences and premises used by individuals involved in drug
2  trafficking usually contain articles of personal property evidencing the identity of
3  person(s) occupying, possessing, residing in, owning, frequenting or controlling the
4  residence and premises.

5    h.    Drug traffickers commonly use cellphones, blackberries, PDAs,
6  other personal handheld electronic devices, and laptop and desktop computers to
7  communicate with, among others, their customers, their suppliers, and other criminal
8  associates and to store phone numbers, text messages, emails, photographs, physical
9  and email addresses, and other information that constitutes evidence of their drug
10 trafficking activities.  Drug traffickers also commonly store records of the business of
11 distributing and selling drugs, on computers and computer discs, diskettes, cassettes,
12 tapes, and other forms of digital media.  Drug traffickers commonly maintain these
13 items on their person and/or in their residences and vehicles.

14   i.    Individuals involved in drug trafficking often utilize radio scanners,
15 police radios and other electronic equipment in order to conduct counter surveillance
16 upon law enforcement authorities, and usually maintain these items on their person
17 and/or in their residences and vehicles.

18   j.    Individuals involved in drug trafficking often maintain photographs,
19 and/or audio and video recordings of their associates or real and personal property
20 which were acquired with drug proceeds or property utilized to facilitate drug
21 trafficking activities.  Such items are typically maintained in their residences.  Drug
22 traffickers often store information relating to their drug trafficking business on their
23 cellular telephones, PDAs, computers and/or computer disks.

24 **CELL PHONE SEARCH WARRANT METHODOLOGY PARAGRAPH AND**
25 **ATTACHMENTS**
26 Procedures For Electronically Stored Information.
27   56.    It is not possible to determine, merely by knowing the cellular telephone's
28 make, model and serial number, the nature and types of services to which the device is

21

subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

57.   Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

58.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

//

1

## **PRIOR ATTEMPTS TO OBTAIN DATA**

2      59.    The United States has not attempted to obtain this data by other means.

3

## **CONCLUSION**

4      60.    Based upon my experience and training, consultation with other law

5  enforcement officers experienced in drug and financial investigations, and all the facts

6  and opinions set forth in this affidavit, I believe that the items set forth in

7  ATTACHMENT B (incorporated herein by reference), which evidence violations of

8  Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute

9  Controlled Substances); Title 21, United States Code, Sections 841(a)(1) (Possession

10  of Controlled Substances with intent to Distribute); as set forth above, will be found at

11  the **Target Locations** more fully described in ATTACHMENTs A-1 through A-4.

12      61.    Because this is an ongoing investigation and premature disclosure of the

13  investigation could endanger agents and officers, cause the target subjects and others to

14  flee, and cause destruction of evidence, I request that this affidavit, the application for

15  the search warrant, the search warrant, and all other associated court records be sealed

16  until further court order.

17

18

19

20

21

_Leo Tanlu, Special Agent_
_Drug Enforcement Administration_

22

Sworn to and subscribed before me

23  this   _2 6_   day of March 2019.

24

25

26  Honorable Bernard G. Skomal

27  United States Magistrate Judge

28

23